**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

CRYPTO ASSETS OPPORTUNITY
FUND LLC and JOHNNY HONG,
individually and on behalf of all others
similarly situated,

                 Plaintiffs,

*v.*

BLOCK.ONE, BRENDAN BLUMER,
DANIEL LARIMER, IAN GRIGG, and
BROCK PIERCE,

                 Defendants.

---

Civ. No. ___1:20-cv-3829___

**JURY TRIAL DEMANDED**

---

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiffs Crypto Assets Opportunity Fund LLC and Johnny Hong, together and on behalf of all others similarly situated, by their undersigned attorneys, bring this action against Defendants Block.one, Brendan Blumer, Daniel Larimer, Ian Grigg, and Brock Pierce (collectively, "Defendants"). With knowledge of their own acts and acts taking place in their presence, and upon information and belief as to all other matters, Plaintiffs allege the following:

## I.   SUMMARY OF THE ACTION

1.    This is a federal securities class action that asserts claims under the Securities Act of 1933 (the "Securities Act") and the Exchange Act of 1934 (the "Exchange Act").  This action is brought on behalf of all investors who purchased securities issued by Block.one called "EOS Tokens" (the "EOS Securities") during the period of June 26, 2017 to the present (the "Class Period").  This action asserts claims arising under Sections 5 and 12(a)(1) of the Securities Act for failure to register the EOS Securities pursuant to the federal securities laws; Section 12(a)(2) of the Securities Act for issuing the EOS Securities pursuant to a materially false and misleading prospectus; Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder for disseminating materially false and misleading statements concerning the EOS Securities during the Class Period; and Section 15 of the Securities Act and Section 20(a) of the Exchange Act for control person liability.

2.    This case arises out of a fraudulent scheme, fueled by a global frenzy over cryptocurrencies and unchecked human greed, to raise billions of dollars through sales of a cryptocurrency called EOS – an unregistered security – to investors in violation of the United States federal securities laws. To drive the demand for and increase profit from the sales of EOS Securities, Defendants further violated the securities laws by making materially false and

misleading statements about EOS, which artificially inflated the prices for the EOS Securities and damaged unsuspecting investors.

3.     Block.one was founded in early 2017 by Brock Pierce, Brendan Blumer, and Daniel Larimer.  They sought to capitalize on the investor fervor for cryptocurrencies by promising that they would develop software to run a new highly decentralized blockchain (the "EOS Blockchain").  Blockchains are ledgers that record digital transactions between two parties. Access rights to the assets in those transactions are represented by cryptographic tokens, which are commonly referred to as "cryptocurrency."  The most prominent cryptocurrency is bitcoin, but many others exist, including ether.

4.     The most important feature of blockchains is that they are "decentralized." Centralized platforms are controlled by a centralized authority. Some prominent digital examples are Yahoo! and Facebook.  The centralized authority has the power to collect and store user data, can set the rules of engagement for the platform, and can make unilateral determinations that affect all users. Centralization requires inherent trust in the central authority controlling the platform, including that it will ensure that users' data remains secure.  But since all the information flows through a single, central authority, centralized platforms are relatively easy to hack.

5.     Decentralized systems spread the power and authority among many users.  The more users that are tied to a particular system, the more decentralized the platform becomes. Specifically, decentralized platforms such as blockchain depend on many users to verify information, and information flows directly from person to person, rather than through a centralized authority. The main benefits are efficiency (from the elimination of transaction intermediaries); transparency (from ability to access entire record of transactions by any user); and security (from lack of central point of failure).

3

6.     Decentralization occurs in degrees, and Block.one hyped its ability to create a more decentralized system that was superior to the blockchains already in existence: the EOS Blockchain.  In order to fund the development of software that would underlie its new blockchain (i.e., the "EOSIO software"), Block.one began to devise a plan to offer and sell EOS Securities in an "initial coin offering," or "ICO."  Defendants first publicly announced this plan on or about May 22, 2017, at a conference in New York City.  The announcement was accompanied by a flashy, expensive ad purchase on a large billboard overlooking Times Square.

7.     On June 5, 2017, Block.one published a White Paper, which touted "a new blockchain architecture designed to enable vertical and horizontal scaling of decentralized applications. This is achieved by creating an operating system-like construct upon which applications can be built. . . . The resulting technology is a blockchain architecture that may ultimately scale to millions of transactions per second, eliminates user fees, and allows for quick and easy deployment and maintenance of decentralized applications, in the context of a governed blockchain."  The White Paper included a section called "Governance," which highlighted the features that purportedly would enhance decentralization of the EOS Blockchain.

8.     On June 26, 2017, Defendants began selling the EOS Securities in a year-long ICO aimed at both wealthy investors and the general public.  Block.one kept 10 percent of the EOS Securities for itself and solicited online exchanges of digital assets (known as "cryptocurrency exchanges") to list EOS Securities on their platforms and encourage purchases by a wide universe of investors.  Block.one offered and sold EOS Securities using the "EOS Purchase Agreement," which did not comply with the requirements for a registered offering of securities, nor did the EOS Securities qualify for an exemption to the registration requirements under the federal securities laws.  By failing to prepare and file a registration statement, Block.one did not provide critical

information to purchasers of EOS Securities, such as information about Block.one's financial condition, future plans of operation and budget, the proposed uses of investor proceeds, and detailed disclosures of material trends and the most significant factors that made the ICO speculative and risky. Block.one thus failed to disclose information that was relevant to investors' evaluation of Block.one's promises about the EOS Securities and EOSIO software.

9.      Following their initial sale, the EOS Securities also traded in a secondary market, including on the U.S. exchanges Coinbase and Kraken, which are cryptocurrency trading platforms. Since July 2017, just one month after the start of its public sale of EOS Securities, EOS has been trading on these exchanges, soaring to a high of $22.89 on April 29, 2018.

10.      While Block.one did not provide a registration statement, the Individual Defendants, who promoted the sale of the EOS Securities, made dozens of materially false and misleading statements to induce investors to purchase the EOS Securities. These statements were disseminated both prior to the launch of the ICO and throughout its duration, inflating the price of the EOS Securities sold both in the ICO and on the secondary market. The false statements concerned the capabilities of the anticipated EOSIO software that Block.one was developing, including in particular its ability to support a "decentralized" blockchain. Block.one's founders declared the EOS Blockchain superior to existing cryptocurrency blockchains. Contrary to Defendants' false statements, as was slowly revealed throughout the Class Period, the EOS Blockchain was highly *centralized* and was not superior to the other blockchains already in use.

11.      Defendants' efforts to generate demand for, and inflate the price of, the EOS Securities through their use of false statements were successful. By the end of the offering and sale of EOS Securities, Block.one raised over $4 billion from investors worldwide, including from the United States-based investors.

12.     On June 8, 2018, Block.one hosted a software developer conference call to discuss the launch of the EOS Blockchain.  A transcript posted on Reddit.com revealed significant infighting among the developers.  The developers could not agree on both large and small issues, including philosophical questions and arcane technical issues.  Some threatened to launch a competing version of the software.

13.     On June 9, 2018, it was decided that the EOS Blockchain would go live once 15% of EOS Security holders voted in favor of going live.  This prerequisite for going live occurred on June 14, 2019. However, the launch was not smooth.  Almost immediately, users discovered a bug that caused major glitches, requiring EOS to resort to an earlier version of the code and raising questions about how much testing was being performed on the new code.

14.     Additional problems soon began to ensue, particularly as users began to discover that the EOS Blockchain was not, in fact, decentralized, as advertised.  On June 22, 2018, it was reported that EOS block producers froze seven accounts, causing some to question EOS's decentralized system and to label the move as "power abuse."

15.     On November 1, 2018, a blockchain testing company called Whiteblock published results of the "first independent benchmark testing of the EOS software."  Shockingly, the investigation concluded that "EOS is not a blockchain," but "rather a distributed homogenous database management system," because its transactions were not "cryptographically validated."  It further stated that the "foundation of the EOS system is built on a flawed model that is not truly decentralized."

16.     On November 15, 2018, Cointelegraph.com published an article titled, "EOS Proves Yet Again that Decentralization Is Not Its Priority."  It explained that an "arbitrator"

reversed a transaction that had been verified.  This was described as a "decentralization supporters' nightmare," and questioned whether "EOS [is] even trying to be decentralized."

17.     On June 1, 2019, facing criticism that EOS Blockchain was not decentralized as promised, Block.one announced that it was shifting gears and developing a social media outlet, which would be used on its blockchain.  News of this divergence did not sit well with investors.

18.     In addition, in early June 2019, Brock Pierce attended the "Tulip Conferenece" in San Francisco and stated that EOS Blockchain was largely governed by a "Chinese oligarchy."

19.     On September 30, 2019, the United States Securities and Exchange Commission (the "SEC") issued a Cease-and-Desist Order in the Matter of Block.one, ordering the company to cease and desist its violations of the Securities Act.  The SEC has made it clear that the EOS Securities were securities when issued and should not have been sold (and should not continue to be sold) without SEC registration or pursuant to an exemption from registration.

20.     When the problems underlying the EOS Blockchain became manifest, investors suffered losses as they watched the price of the EOS Securities decline from a high of $22.89 on April 29, 2018 to a trading price of $2.66, as of the date of this Complaint.

## II.     THE PARTIES

21.     Plaintiff Crypto Assets Opportunity Fund LLC is an entity formed under the laws of Illinois with principal place of business in Northbrook, Illinois. Crypto Assets Opportunity Fund LLC purchased the EOS Securities during the Class Period on the secondary market.

22.     Plaintiff Johnny Hong is a resident of Solvang, California.  Hong purchased the EOS Securities during the Class Period on the secondary market.

23.     Defendant Block.one is an entity formed under the laws of the Cayman Islands with offices, operations, and employees in New York City, California, Virginia, and Hong Kong.

24.     Block.one is operated and owned by a small group of individuals who were instrumental in Block.one's widespread misconduct, described below in paragraphs 25-28 (the "Individual Defendants").

25.     Defendant Brendan Blumer is a co-founder and CEO of Block.one. He was integral to the marketing of Block.one's EOS Securities.  Blumer resides in Hong Kong.

26.     Defendant Daniel Larimer is a co-founder and Chief Technology Officer ("CTO") of Block.one. He was integral to the marketing of Block.one's EOS Securities. Larimer resides in Blacksburg, Virginia.

27.     Defendant Ian Grigg is a former partner of Block.one. He disseminated information about EOS Securities to the general public to drive demand and increase price.  Grigg resides in Hong Kong.

28.     Defendant Brock Pierce is a co-founder and former partner of Block.one. He is a former child actor and prominent bitcoin investor who talked often about Block.one at conferences and promotional videos. Pierce resides in Puerto Rico.

### III.    <u>JURISDICTION AND VENUE</u>

29.     This Court has original jurisdiction over Plaintiffs' federal securities laws claims pursuant to 28 U.S.C. §§1331, 1337, 15 U.S.C. §77v and Section 27 of the Exchange Act (15 U.S.C. §§78aa).

30.     Venue lies within this District under Section 22 of the Securities Act (15 U.S.C. §77v(a)), Section 27 of the Exchange Act (15 U.S.C. §78aa) and 15 U.S.C. §22, 18 U.S.C. §1965, and 28 U.S.C. §1391(b) because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in New York City.

31.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, to effectuate their illegal scheme.

32.    Defendants' willful violations of securities law and other unlawful conduct alleged herein had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects give rise to Plaintiffs' claims within the meaning of 15 U.S.C. §6a.

33.    This Court has personal jurisdiction over Defendants because each Defendant transacted business, promoted the offering of EOS Securities, maintained substantial contacts, and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy and breach of fiduciary duty in the United States, including in this District. The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York City.

34.    Personal jurisdiction over all Defendants comports with the United States Constitution and the New York long-arm statute, N.Y. C.P.L.R. §302.

**IV.    BACKGROUND FACTS**

**A.    Cryptocurrencies and Blockchain Technology**

35.    Cryptocurrencies are digital assets that act as a medium of exchange or a store of value, or both.  They are designed to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.  Bitcoin was the world's first, and most popular, cryptocurrency.  It currently has a market capitalization of approximately $126 billion, and investor enthusiasm surrounding bitcoin has generated a broad market for other cryptocurrencies with some varying features.

36.     The core technical feature of most cryptocurrencies is the "blockchain," which is essentially a ledger that tracks ownership and transfer of the cryptocurrency at issue.  As the SEC explained in a July 2017 investor bulletin:

> A blockchain is an electronic distributed ledger or list of entries – much like a stock ledger – that is maintained by various participants in a network of computers. Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.

Information held on a blockchain exists as a shared and continually reconciled database.  The blockchain database is not stored in any single location; rather, it is distributed – or decentralized – because it is hosted and perpetuated by millions of computer "nodes" around the globe.  This means that, for a widely distributed blockchain network, it would be extremely difficult, if not impossible, to submit a false or malicious transaction because a malicious actor would have to gain control of the majority of the nodes on the blockchain to achieve its purpose.  Once a transaction is recorded on the blockchain, it cannot be cancelled, changed, or reversed, and all transaction records are available all the way back to the blockchain's inception.

37.     Each blockchain is subject to different technical rules devised by their creators, but they all seek to attain the goal of decentralization.  To achieve this, they provide a framework of incentives to encourage users to do the work of validating transactions, which often requires significant computational mechanics.  This has the effect of making the blockchain more accurate and secure.  In the instance of Bitcoin network, users who validate transactions on the Bitcoin blockchain are rewarded with newly minted bitcoin.  This process is referred to as "mining," and those who validate information in exchange for bitcoin are thus called "miners."

38.     Those who do not acquire bitcoin through mining may purchase it through an online cryptocurrency exchange.  These exchanges provide a convenient and accessible marketplace for buyers and sellers to meet and transact, similar to traditional exchanges.

39.     Ethereum is another type of blockchain, and it functions similarly to the Bitcoin blockchain with regard to miners' validation of the network, except in this case, they are rewarded with newly minted ether.  Ethereum differs from Bitcoin, however, because it enables "smart contracts," which are programs that verify and enforce the negotiation or performance of binary contracts.  They are thus self-executing and self-enforcing, making the transactions more secure and less costly.

40.     To understand a smart contract in more concrete terms, consider a hedging contract. Each party may dedicate $1,000 worth of ether, and at the end of the month, one will receive back $1,000 of ether at the dollar exchange rate, while the other receives the remainder of the ether. Depending on whether ether's value has increased, the party receiving the remainder of the ether may have an asset worth more or less than the $1,000 originally committed.  A smart contract enables these parties to submit the ether to a secure destination, which will automatically distribute the ether in accordance with the terms of the hedging contract at the end of the month, without any third-party action.

41.     To facilitate widespread adoption of smart contracts, the Ethereum community has developed Ethereum Request for Comments ("ERCs").  ERCs are application standards and may be created by anyone.  If an ERC is adopted by the Ethereum community, it provides for uniform transactions, reduced risk, and efficient processes.  The most widespread use of ERCs is to allow individuals to create and launch new digital tokens.

42.     ERC-20 is an application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 allows for the creation of smart-contract tokens on the Ethereum blockchain, known as ERC-20 tokens.  A key distinguishing feature of ERC-20 tokens is that they do not operate on their own, independent blockchain; instead, they operate on the Ethereum blockchain.  Certain features of the many varieties of ERC-20 tokens vary, such as the total supply and ticker symbol, but they are all compliant with the ERC-20 application standard.  Because they are easy to create and deploy, anyone with a basic understanding of Ethereum can create ERC-20 tokens and sell them to investors.  The EOS Securities at issue in this lawsuit began as ERC-20 tokens.

**B.**     **The EOS Project and Resultant ICO**

43.     Investor demand for cryptocurrencies had initially fluctuated, but by the end of 2016, was growing at an unprecedented rate.  ICOs became a popular way for entrepreneurs to capitalize on this unbridled enthusiasm.

44.     ICOs are typically announced and promoted via online public channels and social media, including the issuer's website and popular online forums such as bitcointalk.org, Reddit, Twitter, Telegram channels, and others. Many of these postings encouraged trading in cryptocurrencies, such as EOS, for profit. After the completion of the issuance, the issuer would deliver its tokens to the participant's unique address on the blockchain.

45.     In advance of the ICO, issuers typically release technical white papers and other marketing materials that describe the new, revolutionary blockchain architecture and the terms of the issuance.  None of those materials typically cover the information required to be included in a registration statement filed with the SEC, such as a plain English description of the offering, key risk factors, and description of important information and management incentives.

46.    The overwhelming majority of ICOs sold ERC-20 tokens, such as the EOS Securities at issue here.

47.    In May 2017, Block.one announced its existence and purpose: to generate a superior decentralized EOS Blockchain.  This news was heralded with much fanfare through a series of conferences and events attended by Block.one, including the flagship Consensus Conference in New York City on May 22, 2017.  The New York conference was punctuated by a large billboard sign prominently displayed in Times Square:



48.    On June 5, 2017, Block.one released *The EOS.IO Technical White Paper* (the "EOSIO White Paper"), authored by Daniel Larimer, describing the concept for the EOSIO blockchain:

> The EOS.IO software introduces a ***new blockchain architecture*** designed to enable ***vertical and horizontal scaling of decentralized applications***. This is achieved by creating an operating system-like construct upon which applications can be built. The software provides accounts, authentication, databases, asynchronous communication and the scheduling of applications across hundreds of CPU cores or clusters. The resulting technology is a ***blockchain architecture that scales to millions of transactions per second, eliminates user fees, and allows for quick and easy deployment of decentralized applications***.

49.     In July 2017, Ian Grigg (former Block.one partner) published *EOS – An Introduction*, describing EOSIO as "a performance-based and self-governing blockchain that provides an operating system for building large-scale consumer-facing distributed applications." The publication explains the purpose and technology behind the EOS project and sets forth Block.one's vision to launch a competitor to the Bitcoin and Ethereum blockchains, intended to solve many of the problems faced by those popular iterations of the blockchain technology. EOSIO was pitched by Block.one as intended for "high-performance messaging with business logic. Popular use cases will include supply chain, resource management, user-messaging such as social media, asset issuance and trading, accounting for remittances, and gaming."

50.     To develop and launch EOSIO, Block.one raised capital by selling 900 million EOS Securities via an ICO of the EOS Securities at issue here. The ICO took place from June 26, 2017 to June 1, 2018. 200 million EOS Securities were sold in the first five days of the ICO, with an additional 700 million EOS Securities sold in two million increments every 23 hours thereafter. Block.one retained 100 million EOS Securities.

51.     As was typical for ICO issuers at that time, Block.one did not provide any information that is usually disclosed in connection with an initial offering of securities. Its 14-page white paper posted on the website described new software that promised to handle millions of transactions per second and linked to videos and blog posts describing how the company could use bitcoin's decentralized "blockchain" technology for various purposes, but it did not explain how the proceeds from the ICO would accomplish those goals, or even if they would be used to develop the new blockchain software.

52.     From June 26, 2017 to June 1, 2018, Defendants marketed one billion EOS Securities to the general public purportedly pursuant to an "EOS Token Purchase Agreement." To

14

participate in the token sale, the purchasers of EOS Securities transferred their funds to the public sale contract address.  From there, Block.one then transferred funds to the presumably more secure "funding wallet," owned by Block.one.

53.     In a typical ICO, the funds stay in the funding wallet until after the ICO ends. Issuers often spent the time between the end of the token sale and the first withdrawal of funds performing crucial tasks like setting up the company to receive the funds, ensuring know-your-customer ("KYC") on all contributors, or working with exchanges to make tokens available for trading.  After the end of the ICO, the company typically transfers the contributed funds from the designated funding wallet to other accounts.

54.     Block.one's ICO did not follow this usual pattern.  Instead, throughout the duration of the EOS ICO, Defendants continuously withdrew funds from the funding wallet, beginning as early as five days after the beginning of the ICO.  In total, Defendants permitted the funds to be withdrawn nearly a hundred times, accounting for close to 90% of the total funds raised throughout the ICO period and averaging one withdrawal every 3-4 days.

55.     While withdrawal of funds during an ICO is not expressly prohibited, there are significant concerns about how the withdrawn funds might be used, *e.g*., to buy tokens on cryptocurrency exchanges, resulting in artificially inflated demand for EOS, increasing market price, and fueling speculation and interest in the sale.  Thus, there was some concern over Block.one's withdrawal of funds.  Responding to these concerns, Block.one announced in August 2017 that it was "finalizing an engagement with a third-party auditor to release a public audit designed to provide comfort that block.one has not participated in the EOS token sale in anyway [sic], with any funds."  Yet, no audit report has been made public, despite the ease of doing so with the transaction records that the blockchain inherently provides.

56.     At the conclusion of the ICO in June 2018, Block.one raised over $4 billion, which it classified as "revenue of block.one."

### C.     Defendants Aggressively Marketed EOS Securities in the United States

57.     From 2017 through the present, to drive demand for EOS Securities, Defendants have aggressively courted investors throughout the United States.  Block.one first announced itself at a May 2017 conference in New York City, and punctuated its arrival with expensive ad space on a Times Square billboard.

58.     Block.one's executives and representatives, including, but not limited to, Pierce, Blumer, and Larimer, have spoken at myriad conferences and met potential investors at informal meetups, including in New York. For example, on May 22, 2017, Larimer and Blumer discussed EOSIO software and EOS token distribution as speakers at Consensus, a blockchain industry conference in New York City, and hosted a post-conference reception.

59.      Block.one also promoted its proposed business and ICO to U.S.-based persons on the EOS.IO website and through various social media and forum posts. The EOS.IO website, White Paper, and other promotional statements were accessible to purchasers and potential purchasers, and viewable by U.S. persons.

60.     Block.one released the White Paper on June 5, 2017, which included a section called, "Governance," which promised that "power [would] originate[] with the token holders who delegate [their] power to block producers."  The block producers would be "given limited and checked authority to freeze accounts, update defective applications, and propose hard forking changes to the underlying protocol."  Users were also required to sign a "constitution," which included a detailed protocol for changing the constitution and any source code.  These are key features that underscore the purported "decentralized" nature of the EOS Blockchain.

61. On March 12, 2018, before Defendants had any functional software, former Block.one partner Brock Pierce said about EOS:

> Everything will be better, faster, and cheaper. Everything will be more connected. Everything will be more trustworthy. Everything will be more secure. Everything that exists is no longer going to exist in the way that it does today. Everything in this world is about to get better.

62. On May 3, 2018, in a video titled "The Story of the EOSIO Brand," Brendan Blumer said about Block.one: "We build practical blockchain solutions that are designed to interact with humanity in a way that takes into account the way that we really operate."

63. Defendants worked cooperatively to promote EOSIO as the next, superior version of the existing blockchains, like Bitcoin and Ethereum. To highlight the superiority of the EOS Blockchain, Defendants told prospective investors that "EOS" stood for "Ethereum on steroids."

64. In an interview with *Roanoke Times* in early 2018, Daniel Larimer said – without a hint of hyperbole in his voice – "[EOS] will be better than bitcoin and all the rest. EOS could fundamentally change the way society operates." Despite announcing its grandiose plans to create world-changing tools, Block.one declined to reveal more details "to prevent copycats."

65. Block.one further promoted EOS Securities by publicizing a series of equity investments in Block.one by prominent institutional and high-net-worth individual investors like PayPal's founder Peter Thiel, Jihan Wu of crypto mining hardware giant Bitmain, Alan Howard, Louis Bacon, Christian Angermayer, Lansdowne Investment Company, and Galaxy Digital's Mike Novogratz. By publicizing the news, Block.one suggested that those investors' interest in owning Block.one's equity reflected on the value of EOS Securities. Those investors, however, did not purchase EOS Securities; instead, they purchased shares in the entity that recorded over $4 billion in revenue from the sale of EOS Securities. On May 22, 2019, Bloomberg reported that

Block.one offered to repurchase its shares at a price that returned as much as 6,567% on their initial investments.

**D.**     **Defendants Failed to Deliver a Decentralized EOS Blockchain**

66.     To increase decentralization on the EOS Blockchain, Block.one employed the use of 21 "block producers," who are entities selected by EOS token-holders "through a continuous approval voting system," according to the White Paper.  Block producers are decentralized entities that govern the EOS blockchain and produce the blocks of the blockchain.  EOS's 21 block producers stand in contrast to Bitcoin and Ethereum, which were dominated by fewer than ten large mining entities.  The more block producers, and the more widely dispersed they are, the more decentralized the system is.  Voting power is directly proportional to the amount of tokens held; thus the larger token-holders have more sway in electing block producers.  Further, there would be frequent elections to select the block producers, ensuring that the 21 block producers would be constantly revolving.

67.     The White Paper included a "Governance" section that explained how the EOS Blockchain would purportedly deliver superior decentralization features. It explained that "[g]overnance is the process by which people reach consensus on subjective matters that cannot be captured entirely by software algorithms," and that the EOS.IO software would "implement[] a governance process that efficiently directs the existing influence of block producers."  It further states that "before any change can be made to the blockchain, these block producers must approve it.  If the block producers refuse to make changes desired by the token holders then they can be voted out.  IF the block producers make changes without permission of the tokenholders, then all other non-producing full-node validators (exchanges, etc.) will reject the change."

68.     Block producers were also given a very limited ability to freeze accounts, in the instance where, for example, "a smart contract behaves in an aberrant or unpredictable manner." The ability to freeze accounts was meant to be used sparingly, and required approval of 17 out of 21 block producers.  "If the producers abuse the power they can be voted out and an account will be unfrozen."

69.     Problems underlying the EOS Blockchain began to surface even before it went live. On June 8, 2018, the online technology news outlet *TNW* reported that toward the end of May 2018, hackers had breached Block.one's internal system and sent phishing emails to investors.  A Chinese internet security firm also identified a number of vulnerabilities in the EOS network.

70.     Additional problems were reported in a *Wall Street Journal* article dated June 12, 2018, which described "infighting among the software's fragmented developers," stating that it "still has a way to go before the platform lives up to the hype."  In particular, a transcript of a conference call hosted on June 8, 2018 revealed "wrangl[ing] over issues big and small, from philosophical questions to technical arcana."

71.     The EOS Blockchain went live on June 9, 2018, and shortly thereafter its decentralized properties were called into question.  Specifically, the EOS Core Arbitration Forum ("ECAF"), a body set up to resolve disputes in the EOS community, directed EOS block producers not to process transactions from 27 different addresses, seriously undermining the independence and decentralized authority of the EOS Blockchain.  Its decentralization was further questioned when, on November 8, 2018, an ECAF arbitrator issued an order reversing certain EOS transactions.  The community was outraged that "a single individual [could] make this kind of judgment call" on the EOS Blockchain, which had been heralded as providing superior decentralization.

72.     Ultimately, at the "Tulip Festival" held on June 3 and 4, 2019 in San Francisco, Brock Pierce (who had left Block.one in March 2018), described the EOS block producers as largely governed by a "Chinese oligarchy," which is the exact opposite of the decentralized platform that investors were promised.

73.     Interest in the EOS Blockchain had been flagging for some time in the face of these problems.  Confronted with the apparent truth that Block.one's EOS Blockchain would not deliver a superior decentralized platform, Block.one sought to move in a new direction and enter the social media fray.  Thus, it announced on June 1, 2019 that it would develop a blockchain-based social media application.  This application, named "Voice," promised to be a "more transparent social media platform for the world, where the value of good content gets circulated right back into sustaining the community, not corporate bottom lines."  Block.one further stated that Voice would "cultivate creation, sharing, discovery and promotion of content on social media platforms by real users, not bots and fake accounts.  Through a truly self-sustaining economy of ideas, users will directly benefit from their ideas and engagement on the platform."

74.     As described in more detail in Section V.B., *infra*, each piece of news that Block.one's EOS Blockchain lacked the decentralization that was promised caused the value of the EOS Securities to decline, causing harm to investors who had purchased EOS Securities in reliance on these materially false statements about Block.one.

## V.     DEFENDANTS ISSUED FALSE STATEMENTS IN VIOLATION OF THE SECURITIES AND EXCHANGE ACTS

### A.     Defendants Falsely Claimed the EOS Blockchain Would Provide a Decentralized Platform Superior to Existing Blockchain Options

75.     In the weeks leading up to the ICO, and throughout the Class Period, Defendants issued a series of materially false and misleading statements regarding Block.one's ability to

generate software that would truly create an EOS blockchain that was more decentralized than the existing blockchains.  These statements were disseminated to increase investor demand for the EOS Securities, both in the ICO and in the secondary market as the EOS Securities began to trade on cryptocurrency platforms.  As would later be revealed, Block.one did not have the ability to create a decentralized EOS blockchain.

76.     On June 5, 2017, Block.one issued the "EOS.IO Technical White Paper" to tout the sale of the EOS Securities, authored by Defendant Larimer.  In it, Block.one made the following false statements regarding its ability to generate a decentralized blockchain that would be superior to other available blockchains:

- ***EOS.IO software utilizes the only decentralized consensus algorithm capable of meeting the performance requirements of applications on the blockchain, delegated proof of service.***  Under this algorithm, those who hold tokens on a blockchain may select block producers through a continuous approval voting system and anyone may choose to participate in block production and will be given an opportunity to produce blocks proportional to the total votes they have received relative to all other producers.

- The EOS.IO software is designed from experience with proven concepts and best practices, and ***represents fundamental advancements in blockchain technology.***  The software is part of a holistic blueprint for a globally scalable blockchain society in which ***decentralized applications can easily be deployed and governed***.

- ***The EOS.IO software introduces a new blockchain architecture designed to enable vertical and horizontal scaling of decentralized applications***.  This is achieved by creating an operating system-like construct upon which applications can be built. The software provides accounts, authentication, databases, asynchronous communication and the scheduling of applications across hundreds of CPU cores or clusters. The resulting technology is a blockchain architecture that scales to millions of transactions per second, eliminates user fees, and ***allows for quick and easy deployment of decentralized applications***.

77.     These statements were false and misleading because they falsely suggest that the EOS Blockchain is decentralized.  In fact, the EOS Blockchain was not decentralized, and

Defendants failed to disclose that the EOS Blockchain governance system consisted of a revolving door of "block producers" and could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts.  In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared – contrary to Defendants' false claims that EOS Blockchain was "decentralized" – to be controlled by a small group of "Chinese oligarchs."   Further, the EOS Blockchain was not a "fundamental advancement in blockchain technology."  In fact, it nearly did not launch following a fraught call held on June 8, 2018, among software developers expressing concerns over bugs in the software.

78.     On June 22, 2017, Block.one issued a press release stating that "EOS is being designed to support distributed applications that have the same look and feel of their centralized counterparts."  This statement is false and misleading because it falsely suggests that, in contrast to its counterparts, the EOS Blockchain would not be "centralized" (i.e. would be "decentralized"). Contrary to this suggestion, the EOS Blockchain *was* "centralized."  Defendants knew, but failed to disclose, that the EOS Blockchain governance system consisted of a revolving door of "block producers" and could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts.  In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared not to be "decentralized" but, rather, to be controlled by a small group of "Chinese oligarchs."

79.     On July 5, 2017, Ian Grigg published "EOS-An Introduction, describing EOSIO as a "performance based and self-governing blockchain that provides an operating system for building large-scale consumer-facing distributed applications."   Grigg touted features of Block.one's governance framework, by explaining the block producer system as follows:

Block producers are elected into a round of 21, each producer get one block per round, and is rewarded for the validation of incoming messages and production of the block messages.  A block released by one producer is validated by the next and the next and so forth; if not validated, it is not built upon.  Similar longest-chain mechanics to Bitcoin are followed, and in short order, the producers converge on a longest chain. ***A block that is accepted by a quorum of producers is declared immutable, and the chain of immutable blocks becomes in effect a checkpoint***.

80.     These statements were false and misleading because, contrary to the assertion that a block was "declared immutable" after being accepted by a quorum of producers, a block could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts.  In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."

81.     In early 2018, Defendant Pierce stated about EOS, "Everything will be better, faster, and cheaper.  Everything will be more connected.  Everything will be more trustworthy. Everything will be more secure."

82.     This statement was false and misleading because, in fact, the EOS Blockchain was not more trustworthy and secure.  In fact, it did not possess the key feature that would make it trustworthy and secure: decentralization.  In particular, Defendants failed to disclose that the EOS Blockchain governance system consisting of a revolving door "block producers" could be overridden by a single "arbitrator," who had the power to reverse transactions and freeze accounts. In addition, the voting framework of the EOS Blockchain made it susceptible to placing power in large token-holders, as ultimately happened when it was declared to be controlled by a small group of "Chinese oligarchs."

83.     In addition to false statements concerning EOS Blockchain's purported superior decentralization features, Block.one also falsely announced in August 2017 that it was "finalizing

*an engagement with a third-party auditor to release a public audit* designed to provide comfort that block.one has not participated in the EOS token sale in anyway [sic], with any funds." This statement was released in response to concerns that Block.one insiders were manipulating the price of the EOS Securities.

84.     In fact, this statement was false and misleading.  On October 27, 2018, an article was published in the *Bitcoin Exchange Guide*, reporting that the audit report had yet to be made public.  In fact, to this day, the audit report has never been made public.

### B.     The Truth Is Gradually Revealed Through a Series of Partial Corrective Disclosures

85.     The truth that the EOS Blockchain was not superior to those already existing, and that it did not deliver enhanced decentralization, was revealed slowly through a series of partial corrective disclosures occurring over a year, from June 2018 through June 2019.

86.     On June 8, 2018, the online technology news outlet TNW published an article titled "*The EOS mainnet nightmare: How not to launch a blockchain network*," highlighting that although EOS was supposed to launch on June 2, 2018, the token was "still not live."  The article explained that toward the end of May 2018, hackers had breached Block.one's internal system and sent phishing emails to investors in an attempt to trick investors to give up their ERC-20 tokens.  At the same time, an internet security firm in China had identified a number of vulnerabilities in the EOS network that made it susceptible to certain types of attacks.  Although Block.one initially denied that those issues would delay the EOS launch, by June 8, 2018 the launch still had not occurred, and the Company had even instituted a bounty program whereby hackers could be paid to identify and fix bugs in the EOSIO software.

87.     Indeed, during a meeting of candidate EOS block producers on June 8, 2018, a vote to launch EOS failed largely due to concerns over a specific bug that could potentially prevent

investors from making transactions.  As the TNW article pointed out, "if blockchain companies can't launch an actual product after raising millions (or billions in case of EOS) of dollars, then enthusiasts can hardly complain" when critics argue that blockchain is "crappy" technology.

88.     As the market digested this news, a portion of the inflation in the price of EOS Securities was eliminated, as the price of the EOS Securities fell $2.71 per token, or more than 19%, from an end-of-day price of $14.10 per token on June 9, 2018, to an end-of-day price of $11.39 per token on June 10, 2018.

89.     On June 22, 2018, the ECAF issued an order directing the block producers that maintain the EOS ledger not to process transactions from 27 different wallet addresses suspected of fraudulent activity.  The ECAF did not explain its order, compounding criticism from observers who viewed the move as being akin to government interference and demonstrating that EOS is not, in fact, a decentralized network.  As explained in an article by CoinDesk, the ECAF and its ability to issue orders to block producers is "anathema to the kind of censorship-resistant, distributed network pioneered by bitcoin," in which collective decision-making is a core feature.  One commentator even quipped of the order, "Civil asset forfeiture meets blockchain."

90.     On this news, the price of EOS fell $1.76 per token, or nearly 17%, from an end-of-day price of $10.42 per token on June 21, 2018, to an end-of-day price of $8.66 per token on June 22, 2018.

91.     On October 27, 2018, cryptocurrency news website Bitcoin Exchange Guide published an article decrying Block.one's lack of transparency and highlighting that the Company had never issued a promised audit report to quash accusations that it had engaged in wash trading in late 2017.  As the article observed, Block.one's "lack of communication" had caused the issue

to "snowball[] from idle gossip into a genuine concern that Block One might have engaged in EOS wash trading during their ICO."

92.     As investor frustrations over Block.one's lack of transparency swelled, the price of EOS fell $0.28 per token, or more than 5%, from an end-of-day price of $5.43 per token on October 28, 2018, to an end-of-day price of $5.15 per token on October 29, 2018.

93.     On November 8, 2018, an ECAF arbitrator issued an order reversing certain EOS transactions to restore control over a hacked account to its original owner.  That decision went largely unnoticed until a screenshot of the order was posted to Reddit on November 10, 2018 and subsequently picked up by the cryptocurrency press beginning on November 13, 2018.  In its article on the latter date, BREAKERMAG wrote that commentators were "ridiculing the mutability of the EOS blockchain" and were critical of the "governance processes that allowed a single individual to make this kind of judgment call."  The article continued that the "ability to reinstate ownership of a hacked account by decree speaks to a degree of centralized governance that's unheard of in the bitcoin network."

94.     In reaction to this partial corrective disclosure, the price of EOS Securities declined $0.76 per token, or more than 14% over two trading days, from an end-of-day price of $5.40 per token on November 12, 2018 to a close of $4.64 per token on November 14, 2018.

95.     On June 1, 2019, Block.one announced that it planned to launch a new social media platform, "Voice," on the EOS Blockchain.  While criticizing existing social media platforms as being "designed to use their users" and sustain "corporate bottom lines," the Company touted Voice as a "more transparent social media platform for the world."  In that vein, Defendant Blumer said in Block.one's press release that "[b]y design, [social media platforms] run by auctioning our information to advertisers, pocketing the profit, and flooding our feeds with hidden agendas

dictated by the highest bidder."  By using EOS's public blockchain, the Company said that transparency would "be a core part of the experience" with Voice and there would be "no invisible interests."  At an event hosted by Block.one that day, Blumer added that "[s]ocial media has not been a good friend to us" and further promised that Voice would not use algorithms to determine what content users see, unlike existing social media platforms.

96.     The shift away from creating a decentralized blockchain to focusing on social media was not well received by investors.  The price of EOS Securities declined $0.73 per token, or nearly 9%, from a closing price of $8.51 per token on May 31, 2019, to an end-of-day price of $7.78 per token on June 1, 2019.

97.     Days later, during the Tulip Conference in San Francisco, California, which was a conference focused on new and emerging technologies, Defendant Pierce made the startling admission that the EOS "ecosystem is a little bit of a Chinese oligarchy right now" in that much of the power over the EOS Blockchain was focused in a relatively small number of block producers in China.  Pierce indicated that it was a problem to have the power so centralized, and spoke to a number of proposals on how to "solve this issue."

98.     On that news, the price of EOS Securities suffered a two-day slide of $1.46 per token, or nearly 19%, from an end-of-day price of $7.77 per token on June 2, 2019 to an end-of-day price of $6.31 per token on June 4, 2019.

## VIII.   DEFENDANTS' FALSE STATEMENTS WERE MADE WITH SCIENTER

99.     For the purposes of Plaintiffs' Exchange Act claims, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

100.    Defendants, by virtue of their association with and control over Block.one, which made them privy to confidential information, participated in the fraudulent scheme designed to mask the truth underlying the capabilities of the EOS Block.one and its decentralization capabilities.

101.    In addition, Defendants Pierce and Larimer made affirmative statements regarding the value of the EOS Securities and are therefore charged with knowledge of the truth underlying those statements.

102.    Defendants also had motive and opportunity to inflate the price of the EOS Securities.  In particular, at least 90% of the $4 billion raised in the ICO was withdrawn, with no explanation for how these funds were used.

103.    In addition, the false statements concerned the development of the EOSIO software and resulting EOS Blockchain, which was the sole core operation of Block.one.

## IX.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

104.    For the purposes of Plaintiffs' Exchange Act claims, they will rely on the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public statements or failed to disclose material facts required
    to be disclosed;

(b) The omissions and misrepresentations were material;

(c) The EOS Securities traded on an efficient market;

(d) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the EOS Securities; and

(e) Plaintiffs and the other members of the Class purchased the EOS Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts or their consequences were disclosed, without knowledge of the misrepresented or omitted facts.

105.    At all relevant times, the market for EOS Securities was efficient for the following reasons, among others:

(a) Defendants regularly communicated with public investors via widely dispersed public media, including regular dissemination of press releases; and

(b) EOS Securities traded on the Coinbase, Kraken, and Poloniex cryptocurrency exchanges, among others, which are efficient markets.

106.    As a result of the foregoing, the market for EOS Securities promptly digested current information regarding EOS Securities from all publicly available sources and reflected such information in the price of EOS Securities.  Under these circumstances, all purchasers of EOS Securities during the Class Period suffered similar injury through their purchases of EOS Securities at artificially inflated prices, and a presumption of reliance applies.

107.    In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

### X.      DEFENDANTS' FAILURE TO REGISTER THE EOS SECURITIES VIOLATED SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT

108.    On September 19, 2019, the SEC published a Cease-and-Desist Order, recognizing that the EOS Securities are securities within the meaning of the federal securities laws:

29

"Based on the facts and circumstances set forth below, the ERC-20 Tokens were securities under the federal securities laws pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny, including the cases discussed by the Commission in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO (Exchange Act Rel. No. 81207) (July 25, 2017) ("DAO Report"). A purchaser in the offering of ERC-20 Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains. Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

(i)     *EOS Token Purchasers Invested Money*

109.    In the Cease-and-Desist Order, the SEC determined that:

From June 26, 2017 through June 1, 2018 (the "Relevant Period"), Block.one conducted a "token distribution," or "initial coin offering" ("ICO"), in which it publicly offered and sold 900 million digital assets ("ERC-20 Tokens") in exchange for Ether, a digital asset, to raise capital to develop the EOSIO software and promote the launch of EOSIO-based blockchains.

110.    Purchasers of EOS Securities used traditional and other cryptocurrencies, such as bitcoin and ether, to invest in the EOS ICO and to obtain EOS securities in exchange for this consideration. EOS Securities were also listed on the U.S.-based online cryptocurrency exchanges Coinbase, Kraken, and Poloniex, which permitted investors to purchase EOS securities with U.S. dollars as well as bitcoin and ether.

(ii)    *EOS Token Purchasers Invested into a Common Enterprise*

111.    Defendants made clear – and the SEC concluded – that the purpose of the EOS ICO, like other types of investment, was "to raise capital to develop EOSIO software and promote the launch of EOSIO-based blockchains," and Block.one organized and ran the ICO and pooled and controlled investors' assets. Investors were passive participants in the EOS ICO, and the profits of each investor were intertwined with those of Block.one and other investors.

30

112.    In a press release dated July 1, 2017, Block.one further explained that Defendants'
financial interests were aligned with those of investors because it had allocated 10% of EOS
Securities to "ensure that block.one has aligned interests with those participating in the EOS Token
distribution."

113.    EOS Securities were also tradeable on online cryptocurrency exchanges, and all
investors were affected equally if the demand and price of EOS Securities increased or decreased.

114.    Plaintiffs and others in the Class, therefore, participated in a common enterprise by
purchasing the EOS Securities.

(iii)    *EOS Token Purchasers Expected to Profit from Owning EOS Securities*

115.    As the SEC concluded in the Cease-and-Desist Order,

> Block.one offered ERC-20 Tokens in order to raise capital and build a
> profitable enterprise, and ERC-20 Token purchasers would reasonably have
> understood that if Block.one was successful in doing so, their token
> purchase would be profitable.

Purchasers of EOS Securities, therefore, expected to reap substantial profits from their investment,
as described in more detail below.

116.    First, Defendants themselves recognized, both implicitly and explicitly, that
investors in the EOS ICO have a reasonable expectation of profit.  Per the Cease-and-Desist Order,

> Block.one stated that the ICO proceeds were "revenue" of the
> Company, and that it would use the proceeds to build a profitable
> enterprise by, among other things, developing the EOSIO software
> and promoting the widespread adoption of EOSIO and launch of
> anticipated EOSIO-based blockchains. Purchasers thus would have
> understood that Block.one's success in building and promoting the
> EOSIO software and promoting the launch of one or more EOSIO-
> based blockchains would make their token purchase profitable.

117.    Second, the contributions received from investors were being pooled and managed
by Defendants (and specifically, Block.one) to fund projects that would increase the adoption of

the EOSIO-based blockchains, thereby increasing the value of the EOSIO software and EOS Securities:

> In January 2018, seven months into the 12-month ERC-20 Token offering, Block.one announced that it would invest $1 billion from the offering proceeds to "offer[] developers and entrepreneurs the funding they need to create community driven businesses leveraging EOSIO software." In describing Block.one's plans to invest the proceeds of the ERC-20 Token sale to fund businesses that would use, directly or indirectly, an EOSIO-based blockchain, Block.one stated that "the money we spent on those initiatives will be returned value for the network" and that the money raised in the ICO would be spent wisely to fund development of EOSIO-based blockchains.

118.   Third, the investors who purchased EOS Securities openly stated that they were investing in EOS Securities to make a profit.  Defendants, in turn, actively promoted the EOS Securities' appreciation potential in the Technical White Paper:

> A blockchain using EOS.IO software also awards block producers tokens every time they produce a block. The value of the tokens will impact the amount of bandwidth, storage, and computation a producer can afford to purchase; this model naturally leverages rising token values to increase network performance.

119.   At the time of the EOS ICO, purchasers of EOS Securities explored various cryptocurrency exchanges and public forums and social media sites that promoted the ICO and encouraged trading EOS Securities for profit.  For example, on the popular forum Bitcointalk.org, one poster asked, "I'm still on the fence with EOS and I'm not too sure why.  I remember looking at it around $1.80 and thinking I'll leave it, then it took off and thought well it's too late now and it's been on my watch list ever since.  Is it still a worthwhile investment?"  One of the responses stated, "the decline in EOS prices from the end of April from $21 to the present price of $5, *this is the right time to buy as much as possible, never hesitate to invest in EOS, the future is waiting.*" (Emphasis added.)

120.    Finally, Defendants sold EOS Securities to investors before Block.one developed the network, or ecosystem, in which the tokens could be used.  Even before the commencement of the EOS ICO, EOS securities were available for trading on major online cryptocurrency exchanges, including to United States investors. The ability to sell investments in liquid markets is an important consideration for investors because it represents one way in which they can realize profits from their investments.  Indeed, even before the official launch of the EOS Blockchain, the EOS Securities sold for as high as $22.89 each in secondary trading markets.

*(iv)    EOS Token Purchasers Expected Profits to Be Derived from Defendants' Efforts*

121.    Plaintiffs and the Class have entirely passive roles vis-à-vis the success of the EOS Blockchain.  The project's success and the profits reasonably expected by the Class to be derived from the project depended solely on Defendants' entrepreneurial and managerial efforts.

122.    From the outset, Defendants conceived the EOS Blockchain, organized and managed the capital raise, set up Block.one to develop software, and chose Block.one's directors, executives, and all persons critical to EOS's success.  Through their conduct and marketing materials, Defendants repeatedly represented that they would be relied on to provide significant managerial efforts required to make EOS a success.  Brendan Blumer, in an interview with Bloomberg Markets and Finance on September 27, 2018, reiterated Block.one's commitment to financing the development of the EOS ecosystem, stating that, "the first billion dollars of capital [will be invested into] developers building on the EOSIO application itself."

123.    Defendants actively promoted the EOS Token Offering, conducting interviews on social media and at conferences across the United States and advertising the EOS Token Offering in Times Square.

33

124.    Plaintiffs and the Class could have reasonably expected Defendants to provide significant managerial efforts, develop EOSIO software, sustain a supportive network after its launch, and maintain stable token prices on cryptocurrency exchanges. Daniel Larimer's commitment to Block.one in particular has been raised as a crucial factor in EOSIO's success.  For example, one of the users on the popular online forum reddit.com posted: "I think Dan [Larimer] should commit to block.one for 10 years.  For one reason, block.one is Dan Larimer, if he leaves they [sic] will be no more block.one. This is a massive project that needs some level of certainty." Indeed, on November 28, 2018, the cryptocurrency market reacted negatively, and immediately, to Larimer's announcement that he was interested in working on a new cryptocurrency project, sending EOS price on a 32% decline from before the announcement.

125.    Defendants have expressly acknowledged the importance of Block.one's team to the success of the project.  For example, in response to a question about departures of some of Block.one's early partners in 2018, Brendan Blumer emphasized Block.one's team's commitment to the success of the EOS Project and EOSIO, stating that, "none of the core team has left, none of the people who have actually been building the technology since the beginning."

126.    Nevertheless, throughout their unlawful capital raise, Defendants continued to mislead investors – who had neither sufficient information about Defendants and the EOS ICO nor clear understanding of the applicable legal framework – that the EOS Token offering was not subject to federal and state securities laws.

127.    It its September 30, 2019 Cease-and-Desist Order, the SEC concluded that:

> Over the approximately year-long ICO, ERC-20 Token purchasers' expectations were primed by Block.one's marketing of the ERC-20 Token and anticipated EOSIO blockchains. To market the ERC-20 Token, Block.one created the EOS.IO Website and published an EOS White Paper and an "Introduction to EOS" technical paper. During the ICO, Block.one also was developing EOSIO software and released beta versions of the

software to the public. Its founders also published articles and blog posts to promote the EOSIO software, and actively engaged U.S. purchasers and potential U.S. purchasers on social media, online message boards, and other outlets. *In the course of marketing the EOSIO software, Block.one encouraged U.S. purchasers to rely on the founders' expertise and vision to secure the widespread adoption of the EOSIO software and anticipated launch of one or more EOSIO blockchains.*

128.    The SEC also concluded that Block.one engaged in the widespread promotion of the EOS securities in the U.S.:

> Block.one also undertook efforts for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the U.S. for the ERC-20 Tokens, including by engaging in directed selling efforts. Among other things, Block.one participated in blockchain conferences in the U.S., including a prominent conference held in New York City in May 2017, to promote Block.one and which at times also promoted its ICO. In connection with the May 2017 Conference, Block.one advertised EOSIO on a large billboard in Times Square on May 22, 2017, promoted EOSIO in informal informational sessions, and hosted a post-conference reception. Block.one also promoted its proposed business and ICO to U.S.-based persons on the EOS.IO Website and through various social media and forum posts. The EOS.IO Website, White Paper, and other promotional statements were accessible to purchasers and potential purchasers, and viewable by U.S. persons.

129.    As a result of the SEC's enforcement action, Defendant Block.one consented to a $24 million settlement with the SEC, despite Block.one's raising approximately $4 billion with its violative conduct.  This fine of approximately 0.6% of Defendants' ill-gotten proceeds can hardly be viewed as a deterrent to Defendants or others from engaging in such illegal conduct in the future.

## XI.     <u>CLASS ALLEGATIONS</u>

130.    Plaintiffs bring this action as a class under Fed. R. Civ. P. 23 and seek certification of the Class defined as follows:

> All persons or entities that purchased EOS Securities at any time during the Class Period, June 26, 2017 through the present.

131.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Block.one, members of the Block.one's Board and members of their immediate families (as defined in 17 C.F.R. S 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Block.one.

132.    Plaintiffs reserve the right to amend the Class definition if further investigation or discovery indicate that the Class definition should be narrowed, expanded, or otherwise modified.

133.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but by virtue of the fact that Defendants issued approximately 900 million EOS Securities, the potential number of Class members is quite vast. Members of the Class may be identified by publicly accessible blockchain ledger information. They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in class actions.

134.    Defendants have acted on grounds that apply generally to the Class, so that final relief is appropriate respecting the Class as a whole.

135.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a) Whether Defendants violated Sections 5 and 12(a)(1) of the Securities Act by failing to file a registration statement for the EOS Securities with the SEC;

(b) Whether Defendants violated Section 12(a)(2) of the Securities Act by promoting the sale of the EOS Securities pursuant to a prospectus which included material false statements or omitted to disclose material facts;

(c) Whether Defendants violated Section 10(b) of the Exchange Act by disseminating material false statements, or omitted to disclose material facts, concerning the EOS Securities throughout the Class Period;

(d) Whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f) Whether the price of the EOS Securities was artificially inflated; and

(g) the extent of damage sustained by Class members and the appropriate measure of damages.

136.    Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent. Defendants' practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

137.    Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class actions and securities law. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

138.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action on the other hand, would achieve substantial economies of scale with regards to time, effort, and expense, and would assure uniformity of decision with

respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Furthermore, the interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Finally, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

139.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

## XII.    CLAIMS

### FIRST CAUSE OF ACTION
**Violation of Sections 5 and 12(a)(1) of the Securities Act**
**(Against All Defendants)**

140.    Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

141.    This Count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 12 U.S.C. §§ 77e and 77l(a)(1), on behalf of the Class, against all Defendants.

142.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

143.    Defendants, and each of them, promoted, offered, or sold securities through and after the EOS ICO.

144.    Defendants, and each of them, are issuers, underwriters, or necessary participants in the EOS ICO.

38

145.    No Defendant or other person filed with the SEC a registration statement for the offer and sale of EOS securities through or following the EOS ICO, no registration statement was in effect at the time of the EOS ICO, and no exemption to the registration statement was available.

146.    By virtue of the foregoing, without registration statement in effect as to the EOS securities, Defendants, and each of them, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to offer to sell, through the use of means of a prospectus, securities for which no registration statement has been filed and no exemption to the registration statement was available.

147.    Defendant Block.one has already admitted to the above violations.

148.    The Individual Defendants knowingly and willfully took individual actions to facilitate said securities laws violations.

149.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to the Plaintiffs and the Class for rescission and damages suffered.

**SECOND CAUSE OF ACTION**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against All Defendants)**

150.    Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

151.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

152.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and Block.one is the issuer of the securities purchased by Plaintiffs and the Class.

153.   Defendants offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) the EOS Securities within the meaning of the Securities Act, by means of a prospectus, as that term is broadly construed.

154.   Defendants' statements made in connection with the offer, sale or solicitation of the purchase of the EOS Securities included untrue statements of material fact, and/or omitted to state material facts, necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

155.   Defendants acted negligently in that they did not exercise reasonable care to ensure that the statements they made in connection with the offer, sale or solicitation of the purchase of the EOS Securities did not include untrue or misleading statements or omissions of material fact.

156.   This Count does not sound in fraud. Rather, this Count is based solely on negligence.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that any Defendant acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in (or incorporated by) the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offering.

157.   The statements Defendants made in connection with the ICO – including statements made in the White Paper, and at all associated conferences, YouTube videos, press releases, interviews, and other statements made for the purpose of offering and/or selling the EOS Securities – fall within the broad definition of "prospectus" in Section 12(a)(2) of the Securities Act.

158.   When they acquired the EOS Securities, Plaintiffs and the other members of the Class did not know, nor could they have known in the exercise of reasonable care, of the untruths or omissions contained (and/or incorporated by reference) in the Prospectus.

159.    Plaintiffs and the Class acquired EOS Securities pursuant or traceable to the offering conducted by Defendants and without knowledge of the untruths and omissions alleged herein.  Plaintiffs sustained damages, and the price of EOS Securities declined substantially due to those material misstatements and omissions.

160.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to the Plaintiffs and the Class for rescission and damages suffered.

### THIRD CAUSE OF ACTION
**Violation of Section 15 of the Securities Act**
**(Against the Control Person Defendants)**

161.    Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

162.    This Count is asserted against Defendants Brendan Blumer, Daniel Larimer, Ian Grigg, and Brock Pierce (collectively, the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

163.    The Control Person Defendants, by virtue of their offices, share ownership, agency agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.  The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of EOS securities as described herein.

164.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Block.one, through the ownership of voting securities, by contract, subscription agreement, or otherwise.

165.    The Control Person Defendants, separately or together, jointly participated in, and aided and abetted, Block.one's failure to register the EOS securities offering and solicitation of securities transactions.

166.    By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to the Plaintiffs and the Class for rescission and damages suffered.

### FOURTH CAUSE OF ACTION
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against All Defendants)

167.    Plaintiffs hereby incorporate by repeat and reallege every allegation contained above as if fully alleged in this Count.

168.    The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).  Defendant Block.one, by engaging in the conduct described above, promoted, offered, or sold EOS securities.

169.    Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5(b) promulgated thereunder (17 C.F.R. §240.10b-5(b)) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

170.    Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase EOS Securities

at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

171.    During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew or recklessly disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

172.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for EOS Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of EOS Securities as specified herein.

174.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EOS Securities' value and performance and continued substantial growth, which included the making of, or participation in the making of, materially false and misleading statements, including statements that omitted to state material facts necessary in order to make the statements made about Block.one's business

operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of EOS Securities.

175.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true condition and growth prospects, thereby artificially inflating the price of its common stock.   As demonstrated by Defendants' omissions and misstatements concerning the Company's business strategy, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading, or suffered from actionable material omissions.

176.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of EOS Securities was artificially inflated.  In ignorance of the fact that price of EOS Securities was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by these Defendants, or upon the integrity of the market in which its common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements by Defendants, Plaintiffs

and the other members of the Class acquired EOS Securities at artificially high prices and were damaged thereby.

177.   By reason of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

178.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of EOS Securities.

### FIFTH CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act
### (Against the Control Person Defendants)

179.   Plaintiffs hereby incorporate by repeat and reallege every allegation contained above as if fully alleged in this Count.

180.   The EOS Securities are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

181.   This Count is asserted against Defendants Brendan Blumer, Daniel Larimer, Ian Grigg, and Brock Pierce (collectively, the "Control Person Defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. §78t.

182.   The Control Person Defendants acted as controlling persons of Block.one and the EOS Securities within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Block.one's operations and/or intimate knowledge of the false statements disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Block.one and the issuance of the EOS Securities, including the content and dissemination of the various statements that

Plaintiffs contend are false and misleading.  These Defendants were provided with or had unlimited access to copies of Block.one's reports, press releases, and other public statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

183.    In particular, the Control Person Defendants had direct and supervisory involvement in the day-to-day operations of Block.one and therefore are presumed to have had the power to control or influence the particular statements giving rise to the securities violations alleged herein, and exercised the same.

184.    As set forth above, Defendants violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

185.    As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of EOS Securities.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs pray:

1.    That the Court maintain this action as a Class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Counsel of the Class, and direct that notice of this action be given to Class members;

2.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

4.    Awarding rescission or a rescissory measure of damages; and

5.      Awarding such equitable and/or injunctive or other relief as the case may require

or as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand a jury trial as provided by Rule 38(b) of the Federal

Rules of Civil Procedure.

Dated: May 18, 2020
       New York, New York                          Respectfully submitted,

                                                    **GRANT & EISENHOFER P.A.**
                                                    */s/ Daniel L. Berger*
                                                    Jay W. Eisenhofer
                                                    Daniel L. Berger
                                                    Caitlin M. Moyna
                                                    485 Lexington Avenue
                                                    New York, NY 10017
                                                    Telephone: (646) 722-8500
                                                    Facsimile: (646) 722-8501
                                                    jeisenhofer@gelaw.com
                                                    dberger@gelaw.com
                                                    cmoyna@gelaw.com

                                                    **KOUTOULAS LAW LLC**

                                                    James L. Koutoulas
                                                    1111 Kane Concourse, Suite 603
                                                    Bay Harbor Islands, FL 33154
                                                    Tel: (312) 836-1180
                                                    Fax: (888) 391-8179
                                                    james@koutoulaslaw.com

                                                    **IEVGENIIA VATRENKO, ESQ.**

                                                    Ievgeniia P. Vatrenko
                                                    2 Northside Piers
                                                    Brooklyn, NY 11249
                                                    Tel: (718) 451-6384
                                                    jenny@vatrenkoesq.com

**NORTHWESTERN PRITZKER
SCHOOL OF LAW**

J. Samuel Tenenbaum
375 East Chicago Avenue
Chicago, IL 60611
Tel: (312) 503-4808
s-tenenbaum@law.northwestern.edu

## CERTIFICATION OF
## SECURITIES CLASS ACTION COMPLAINT

I, Brandon Elsasser, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.  I have reviewed the complaint filed herein (the "Complaint") and have authorized the filing of a similar complaint and a lead plaintiff motion on Crypto Assets Opportunity Fund LLC's behalf.

2.  Crypto Assets Opportunity Fund  did not purchase the securities at issue in the Complaint at the direction of counsel in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.  Crypto Assets Opportunity Fund LLC is willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period (as defined in the Complaint), Crypto Assets Opportunity Fund LLC purchased or sold the unregistered securities EOS.

5.  During the three-year period preceding the date of this Certification, Crypto Assets Opportunity Fund LLC has not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.  Crypto Assets Opportunity Fund LLC will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any possible recovery, except for an award, as ordered by the Court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

Crypto Assets Opportunity Fund LLC
by: Brandon Elsasser
Chief Investment Officer of its
Managing Member
Northbrook, Illinois

## CERTIFICATION OF
## SECURITIES CLASS ACTION COMPLAINT

I, Johnny Hong, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.  I have reviewed the complaint filed herein (the "Complaint") and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.  I did not purchase the securities at issue in the Complaint at the direction of my counsel in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.  I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.  During the Class Period (as defined in the Complaint), I purchased or sold the unregistered securities EOS.

5.  During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.  I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the Court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.  I understand that executing this Certification is not a prerequisite to participation in this Class Action as a member of the Class.

_____
Johnny Hong
Solvang, CA