UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHASE WILLIAMS and WILLIAM ZHANG, individually
and on behalf of all others similarly situated,

> Plaintiffs,

> -against-                                                                                   20-cv-2809 (LAK)

BLOCK.ONE, BRENDAN BLUMER, and DANIEL
LARIMER,

> Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CRYPTO ASSETS OPPORTUNITY FUND LLC and
JOHNNY HONG, individually and on behalf of all others
similarly situated,

> Plaintiffs,

> -against-                                                                                   20-cv-3829 (LAK)

BLOCK.ONE, BRENDAN BLUMER, DANIEL
LARIMER, IAN GRIGG, and BROCK PIERCE,

> Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER

LEWIS A. KAPLAN, *District Judge.*

These two lawsuits are putative securities class actions in which the plaintiffs claim
to have suffered losses arising from their trading of EOS tokens, a type of cryptocurrency.  The
Court grants the motion of plaintiff-movant Crypto Assets Opportunity Fund LLC ("Crypto Assets")
to consolidate these actions, appoint it as lead plaintiff, and approve its selection of lead counsel
[Dkt. 22].  It denies the parallel motion of plaintiffs-movants JD Anderson, David Muhammad,
Rajith Thiagarajan, Chase Williams, and Token Fund I LLC [Dkt. 20] (collectively, the "Williams

2

Group").

  Where, as here, multiple plaintiffs file substantially similar securities class actions and seek appointment as lead plaintiff under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the PSLRA requires that the district court appoint "the most adequate plaintiff" to that role.[1]  The statute creates a rebuttable presumption that the most adequate plaintiff is the one who (1) has moved for appointment, (2) "in the determination of the court, has the largest financial interest in the relief sought by the class," and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."[2]  For the second requirement, courts generally consider four factors: the number of shares purchased, the number of net shares purchased, the total net funds expended by the plaintiff, and, most importantly, the approximate size of the plaintiff's loss.[3]

  According to the Williams Group's papers, Token Fund I lost $537,306.98, Thiagarajan lost $64,793.46, Williams lost $8,100.93, Anderson lost $3,630.69, and Muhammad lost $1,615.33.[4]  But, as these plaintiffs concede, they have failed to submit all of the trading data evidencing the two and perhaps three largest claimed losses.  In its unsworn (and therefore defective[5]) PSLRA certification, Token Fund I asserts that at least $300,000 of its claimed loss is based on its own estimate because the cryptocurrency exchange where it made those trades, a Hong Kong entity called Bitfinex, "refused to provide access to the relevant trading activity."[6]  Thiagarajan's certification (also unsworn) makes no mention of Bitfinex or any failure to document all of the plaintiff's trades, but his data evidently is either incomplete or inaccurate because it suggests that he sold nearly 3,000 more tokens than he purchased despite the fact that the class period begins on the date of the initial public offering for such tokens.[7]  Williams's data appears to

---

[1] 15 U.S.C. § 78u-4(a)(3)(B)(ii).

[2] *Id.* § 78u-4(a)(3)(B)(iii).

[3] *See, e.g.*, 7 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 22:42 (5th ed. 2020) (hereinafter "RUBENSTEIN") (citing cases).

[4] Dkt. 21 at 9.

[5] *See* text accompanying notes 11-12, *infra*.

[6] Dkt. 25-1 at 22; *see also* Dkt. 43 at 4.

[7] Dkt. 25-1 at 16 (original certification); Dkt. 44-3 at 2 (supplemental certification); *see also* Dkt. 43 at 4-5 (conceding for the first time in an opposition brief that "Thiagarajan does not have access to all his EOS purchases").

contain errors, as well, albeit far less consequential ones.[8]  Although the Williams Group contends that these plaintiffs' missing transaction data would increase the sizes of their losses, it has not explained how the Court could verify this assertion based on the materials it has presented.  These parties have not provided a satisfactory reason for failing to substantiate their alleged losses, and the Court is unwilling to engage in guesswork or rely on their unsupported claims, at least two of which are demonstrably inaccurate or incomplete.

Crypto Assets, by contrast, provided a full accounting of its claimed transactions. In its final estimate, after initially using a higher number calculated under an accounting method challenged by the Williams Group, it asserts that it lost $36,229.13.[9]  Accordingly, Crypto Assets has suffered the largest loss that the Court is able to verify of any proposed lead plaintiff.  It has the largest financial interest of any lead plaintiff applicant in the outcome of this lawsuit.

The Court finds additionally that Crypto Assets, at this preliminary stage and for the purposes of the PSLRA, has made a *prima facie* showing that it will be able to satisfy the requirements of Rule 23.  The Rule 23 provisions that generally are relevant during PSLRA appointment disputes concern the typicality of the class representatives and the adequacy of the representatives and their counsel to represent the interests of the absent class members.[10]  The Court has no reason to believe at this time that Crypto Assets is atypical of the class or otherwise would make an inadequate representative.  It allegedly suffered a substantial loss and thus far has complied with the procedural requirements of litigating under the PSLRA.  In addition, the Court finds that Crypto Assets's counsel is up to the task of managing this lawsuit.  Its proposed lead counsel include a law firm with a long track record of representing plaintiffs in securities class actions and a complex litigation clinic at a leading law school led by an experienced practitioner.

Even if the Court were willing to rely on the unsupported assertions of Token Fund I and Thiagarajan that they suffered larger losses than Crypto Assets, it would deny the Williams Group's application.  It would do so because the Williams Group has not satisfied its *prima facie*

---

[8]
The Williams Group asserts in its original memorandum that Williams bought and sold 8,222.87 tokens during the class period for a net purchase of 0 tokens.  Dkt. 21 at 8.  But Williams's trading data states that he bought 8,222.87 tokens and sold 8,223.26.  *See* Dkt. 25-1 at 20.  While this is a minor discrepancy, the Williams Group does not address it in its subsequent filings, despite its adversary flagging the problem.  It does, however, adjust its calculation of Williams's asserted net purchase to -0.39.  *See* Dkt. 51 at 4.  Because the class period begins on the date of the initial public offering for the tokens, the Court is unable to understand Williams's claim that he sold more tokens than he purchased.

[9]
Dkt. 49 at 9.

[10]
*See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001); *Hansen v. Ferrellgas Partners, L.P.*, No. 16-cv-7840 (RJS), 2017 WL 281742, at *3 (S.D.N.Y. Jan. 19, 2017) (Sullivan, *J.*).

4

burden of demonstrating under Rules 23(a)(4) and (g) that the proposed lead plaintiff group and its chosen counsel would be able adequately to represent the putative class.

To begin, there are several defects, some of which already have been flagged, in the Williams Group's application that raise significant doubts about its competency to lead this lawsuit. All five of the Williams Group plaintiffs failed to submit with their motion the required sworn PSLRA certifications that, among other things, must "set[] forth *all* of the transactions of the plaintiff in the security that is the subject of the complaint during the class period."[11] The certifications that they submitted were unsworn, and at least as to Token Fund I, Thiagarajan, and Williams, the trading data either contains errors or does not set forth all of the relevant transactions.[12] While Token Fund I blames this latter problem on Bitfinex, the Williams Group's papers do not make clear why it and the other plaintiffs apparently failed to keep records of their own trades.[13] Regardless of whether these oversights are fatal to the Williams Group's application standing alone, they indicate a lack of diligence on behalf of these plaintiffs and their counsel.

Further, the Williams Group and its counsel have failed to provide satisfactory answers to numerous questions surrounding their proposal to proceed with five lead plaintiffs who apparently do not have a pre-existing relationship. When a group applies for the lead plaintiff role, considerations relevant to the adequacy inquiry for PSLRA purposes "include whether the group's members have a pre-existing relationship, whether they have cooperated effectively thus far, and whether they have a coherent plan for dividing responsibilities, resolving conflicts, and managing the litigation."[14] "[C]ourts have typically required that plaintiffs lacking [a pre-existing] relationship

---

[11]    15 U.S.C. § 78u-4(a)(2)(A) (emphasis added).  The plaintiffs concede that they failed to satisfy this requirement of the PSLRA.  *See* Dkt. 41 at 2 n.1.

[12]    After Crypto Assets flagged this problem, the Williams Group plaintiffs submitted supplemental certifications under penalty of perjury with their memorandum in opposition to the Crypto Assets motion.  Dkt. 44.  They did not, however, correct for the failure to include all of their trading data.

[13]    As noted previously, Token Fund I asserts that Bitfinex "refused to provide access to individual trade data."  Dkt. 43 at 4.  It explains that, "[u]nfortunately, this lack of access is common among individuals who trade on crypto-asset exchanges."  *Id.*  In the portion of its memorandum discussing its proposed lead counsel's litigation experience, the Williams Group notes that in a separate lawsuit, both of its law firms currently represent different plaintiffs who are suing Bitfinex for market manipulation.  *See* Dkt. 21 at 14-15.  Except in this oblique and apparently unintended manner, counsel failed to bring this fact to the Court's attention.  They have not addressed whether their being adverse to an entity that holds and refuses to produce information necessary to their clients' claims may create further difficulties in this litigation.

[14]    *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015).

present a more compelling showing as to their fitness for the position."[15]  This is because there is a substantial risk that large or disparate lead plaintiff groups "can become unwieldy, creating coordination and decision-making problems."[16]  In addition, applications from unrelated plaintiff groups raise doubts "that the group – rather than its lawyers – is truly in charge of the litigation, as the PSLRA hopes."[17]

The Williams Group has not explained adequately why these five apparently unrelated plaintiffs opted to proceed as a group.  Nor has it resolved the Court's concern this decision was, and future decisions by the group would be, driven by the lawyers.  The Williams Group's papers provide almost no meaningful information about the plaintiffs or their plans for managing this case.  And with respect to Token Fund I, the little information submitted to the Court raises serious questions about whether the entity was formed for the purpose of filing this lawsuit and perhaps this very appointment motion.  In its opposition to the Crypto Assets motion (though not in its PSLRA certification), Token Fund I discloses for the first time that it was formed on June 6, 2020 – two months after this lawsuit was filed by other members of the Williams Group, two days before it moved to become lead plaintiff, and long after the alleged trades giving rise to its claims were made.  Only in its reply in support of its appointment motion does Token Fund I disclose the name of its "sole member" who allegedly made these trades.[18]

The Williams Group has failed also to explain why the putative class would benefit from having five lead plaintiffs authorized to make decisions on its behalf.  While large leadership groups occasionally may offer advantages, the application here creates an unnecessary risk of having too many cooks in the kitchen – or, perhaps worse, a risk of having disinterested cooks.  If Token

---

[15] See *Elstein v. Net1 UEPS Techs., Inc.*, No. 13-cv-9100 (ER), 2014 WL 3687277, at *4 (S.D.N.Y. July 23, 2014).

[16] RUBENSTEIN § 22:35 & n.6 (citing cases); *see also, e.g.*, *In re Petrobras*, 104 F. Supp. 3d at 621 (expressing such concerns).

[17] RUBENSTEIN § 22:35 & n.5 (citing cases); *see also, e.g.*, *Khunt v. Alibaba Group Holding Ltd.*, 102 F. Supp. 3d 523, 534 (S.D.N.Y. 2015) (expressing similar concerns).  These problems are somewhat mitigated, though not entirely so, because the Williams Group has disclaimed any argument that the losses of the proposed plaintiffs should be aggregated for the purpose of assessing its petition.

[18] See Dkt. 43 at 3.  Token Fund I's PSLRA certification, which was signed by an "authorized agent" of the entity whose role is unclear, states that the fund consists of an unnamed "sole controlling member" who assigned his holdings and claims to Token Fund I on June 5, 2020 – confusingly, the day before Token Fund I was formed.  Dkt. 44-5 at 2.  The reply memorandum identifies the controlling member as "Benjamin Clarke."  Dkt. 51 at 7.  Although a declaration submitted alongside Token Fund I's reply includes its purported certificate of formation, this document does not mention Mr. Clarke.  See Dkt. 52-1 at 2-3.

Fund I and Thiagarajan are to be believed about their estimated losses, their interest in this lawsuit would be apparent. But the Court questions how the putative class would benefit from the inclusion of Anderson, Muhammad, and Williams. Because they allege to have suffered relatively small losses, their motivation to spend potentially years managing this litigation is doubtful.[19] And while counsel for the Williams Group ask the Court in their reply memorandum to appoint either Token Fund I or Thiagarajan as an alternative to the five plaintiff group proposed in their motion, their last-minute willingness to jettison some of their clients raises further concerns that the application is being driven by the lawyers, rather than the plaintiffs.[20]

Finally, and as noted above, questions of this nature arise regularly when groups of apparently unrelated parties apply for the lead plaintiff position. The failure of the Williams Group and its counsel to provide satisfactory answers thus raises further doubts about their diligence in litigating this matter and their adequacy to represent the absent class members.

For all these reasons, Crypto Assets' motion [Dkt. 22] is granted and the Williams Group's motion [Dkt. 20] is denied. Accordingly, these cases are consolidated. Crypto Assets Opportunity Fund, LLC is appointed Lead Plaintiff. The firm of Grant & Eisenhofer P.A. is appointed Lead Counsel. Unless otherwise ordered, this order shall apply to any securities fraud against Block.One that subsequently may be filed in or transferred to this Court.

SO ORDERED.

Dated:          August 4, 2020

Lewis A. Kaplan
United States District Judge

---

[19]
Cf., e.g., *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) ("The theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff – frequently a large institution or otherwise sophisticated investor – would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price." (citation omitted)).

[20]
*See* Dkt. 51 at 6-7. Moreover, this argument is waived because it was raised for the first time in the Williams Group's reply brief. *See, e.g., Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 169 (2d Cir. 2006).